Good afternoon. You may be seated. Welcome to the Ninth Circuit. This is the time set for argument in Doyle v. Royal. Before we proceed, can I just confirm, Judge Lee, can you hear us? Yes, I can hear you. Thank you. All right. Then, Ms. Murphy, whenever you're ready, you may proceed. Thank you. Good afternoon, Your Honors, and may it please the Court. My name is Jocelyn Murphy, and I'm here on behalf of Petitioner Appellant Antonio Doyle. I'd like to reserve five minutes for rebuttal, and I will keep an eye on my time. Antonio Doyle is facing execution based on a conviction that was entered by a jury from which prosecutors intentionally excluded African American jurors, and based on a habeas review that failed to consider on the merits 80 percent of Doyle's claims, including every claim challenging his death sentence. I'd like to focus my argument today on two specific points, Batson and tolling. And unless this Court prefers I begin elsewhere, I'll start with Batson. The Nevada Supreme Court applied an incorrect legal framework when it determined that the only way Doyle could establish a prima facie case as to juror Velazquez was through a pattern of exclusion. This was contrary to and unreasonable under Batson, as the 14th Amendment protects all prospective jurors from discrimination during voir dire, and not merely those excused by means of a pattern. Under Batson, all Doyle needed to establish was an inference of discrimination based on the totality of relevant circumstances. Because the Nevada Supreme Court prematurely ended its inquiry after it determined that no pattern was evident, its decision is not owed deference by this Court. Had the Nevada Supreme Court... Explain that last bit. When you said no deference, help me understand why you think there's no deference. Because the Nevada Supreme Court's opinion was contrary to Batson when it held that the only way Doyle could establish a prima facie case as to juror Velazquez was through a pattern of exclusion. The Nevada Supreme Court hinged its basis on the fact that Doyle had not established that the second and third jurors who were struck were ultimately found to be non-discriminatory, and thus undoing the pattern, and Doyle could not establish an inference of discrimination. And that was contrary to Batson. Batson does not require a pattern in order for a defendant to establish an inference of discrimination. Had the Nevada Supreme Court applied the correct legal framework, they would have saw that the record in this case is replete with evidence demonstrating an inference of discrimination as to juror Velazquez. Can I ask you... The explanation of this is in the footnote in the Nevada Supreme Court decision. We've got two sentences. Somewhat cryptic. But the first sentence I take to be just a description of what happened below, and it says the trial court declined to order the state to provide an explanation. And that refers to a pattern, because the trial court said there wasn't a pattern. The holding of the Nevada Supreme Court is in the second sentence, where they say after accepting the state's explanation, it was not error for the trial court to refuse to require an explanation. So that doesn't refer to a pattern. So what do you understand the rationale of the Nevada Supreme Court to have been in that second sentence? So the Nevada Supreme Court used the fact that the Samuels and Smith strikings were found to be non-discriminatory as the basis for Doyle not having established a prima facie case. And so that establishes, implicitly, after they first referenced the pattern of exclusion, that it was relying on the fact that there was no pattern because the Samuels and Smith strikings were found to be non-discriminatory. Well, maybe it means that. But what about... Let me offer another possible reading, and you can tell me if this makes sense. That it's not so much that the consideration of the explanation for Samuels and Smith tells you what to do about Velazquez, but that the trial court was entitled to proceed sequentially. It ruled on Velazquez in light of the information it had before it. Then some other stuff happens, namely Samuels and Smith. And it doesn't need to go back and revisit the ruling on the first challenge. Is that a possible reading of what they meant? Well, Your Honor... Maybe that's wrong, too, but is that what they might have been saying? Well, even under that interpretation, what the Nevada Supreme Court did was still unreasonable. Trial counsel renewed the Batson objection as to Velazquez after Smith was struck. And under the interpretation that Your Honor is discussing right now, that would mean that the Nevada Supreme Court would have negated the pattern. And that also misapplies Batson and Perquette because that would be using the ultimate decision at Step 3 to negate a finding at Step 1. So if an inference of discrimination had been created based on a pattern, and Velazquez was always a part of that pattern because she was the first juror struck, so it was based on her striking that the court required trial counsel to provide race-neutral reasons for the second juror struck, Samuels, and the third juror struck, Smith. And so if the court used the ultimate finding at Step 3 that the strikings of Smith and Samuels were nondiscriminatory, then that cannot be used at Step 1 to negate that pattern. Batson and Perquette state that the steps in the burden-shifting framework have to be taken within the proper sequence. So under either interpretation, Your Honor, that would be my answer, is that it is still either contrary to or unreasonable. So in addition to... And just to be... So is it your view, I mean, is it consistent with Batson for a state to say, our procedure is, you know, you object to the first... You make your objection to the striking of an individual juror, and we go through the three steps with respect to that juror. And then if we say that strike is okay, then we're done, then we move on to the next one, then we move on to the next one. And by the time we're, you know, several jurors down, you know, maybe you have more information that sheds a different light on the first one, but you don't need to go back because you can just stick with the ruling you made on the first one. Is the state allowed to do that under Batson? No, that would be contrary to Batson to not allow a defendant to go back, and particularly when it concerns a pattern, because the first juror would always be a part of that pattern, and it would actually undermine Batson's purpose to not permit petitioners through a pattern to go back because the first juror struck would always be immune from constitutional scrutiny, and it would allow prosecutors to always use discriminatory means to strike the first juror as long as the second and third juror were struck for race-neutral reasons. So under Batson, no. Under a pattern, the state would not be allowed to negate that finding under a pattern. Let me ask a question. So if Samuels and Smith were not on the jury pool, let's just pose that, the prosecutor strikes Mr. Velasquez, and then the judge said the same thing that he said at that trial where he said, well, I don't find a pattern here, so I'll move on. Would that violate Batson? Yes, it would still violate Batson for two reasons, Your Honors. First, Batson is clear you do not need a pattern, so using the lack of a pattern as a basis is contrary to Batson. Batson says courts should look at the totality of relevant circumstances, and here at the first strike for Velasquez, there was other evidence creating an inference of discrimination. Specifically, prior to trial, the trial counsel issued pretrial motions warning the trial court that they believed that prosecutors would strike jurors discriminatorily, and prosecutors used their very first strike to remove Velasquez, and prosecutors failed to ask Velasquez any questions during voir dire that would be specific to her questionnaire or that indicated that they had any concern with any of her answers or her juror profile. Additionally, the way that prosecutors... If I can just ask a follow-up question. So under your view of Batson, for even the first juror, you would have to do a Batson analysis all three steps, even if, at least on the face, there may be potentially some grounds, non-discriminatory grounds for striking the juror? Yes, Your Honor, because Batson protects... The 14th Amendment protects all prospective jurors from discrimination during voir dire, and not merely those removed by means of a pattern, and it's for that very reason that the Supreme Court decided Batson. In Swain, the standard was a very high burden for petitioners. They had to prove a pattern of systemic exclusion, and the purpose of Batson was to lower that burden for petitioners. And so even at step one, the court is not to look at whether there's a pattern. They're to assess the totality of relevant circumstances within the record, and that's simply not what happened here. Help me understand why even right off the bat with Ms. Velazquez, there was enough to alert the trial judge that he should have allowed questioning as to why there was the strike. That is to say, we know one thing, okay, we presume that she was black. What else do we have? Yes, Your Honor, the fact that it was the prosecutor's very first strike, the fact that prosecutors only asked Velazquez four questions during voir dire, and all of them were general questions about her veracity to perform and be impartial when she answered the affirmative, and they asked Velazquez nothing specific to anything in her questionnaire or about her juror profile that indicated that they were concerned, and then also the way prosecutors treated Velazquez in comparison to similarly situated non-black jurors. So, yeah, on that last point, what veneer people had come up before Velazquez? Do we have a pattern of questioning before Velazquez gets on the stand to be questioned? So prior to the prosecutor's strike of Velazquez, a prospective non-black juror, Juror Renard, testified, and Juror Renard's profile in comparison to Velazquez made her less favorable because her mother had been arrested for DUI, so she had more serious criminal associations, and she indicated that she had a highly negative view of police officers, and so that prosecutors chose not to challenge prospective Juror Renard, but did challenge Velazquez, who was by all intents and purposes an ideal juror, who testified that she had a positive view of police because her best friend was a retired police officer, and her only criminal association was that she was present when her niece was arrested for shoplifting, raised an inference of discrimination here. And there was even more evidence after trial counsel renewed its bats and objection after Samuels was struck through the three out of four jurors being removed, and then also the warnings against exclusion. Here the trial court warned prosecutors throughout Vaudeer three separate times that it found its conduct highly unusual in how it was excluding African-American jurors. So I'm going to come back to the point that you made. So you're arguing that even without respect to what comes afterwards, at the time that Ms. Velazquez is on the stand as a veneer person, there was enough already to require questioning under Batson. There was already a primification. Yes, Your Honor. Yes, Your Honor. But the trial court was merely focused on a pattern, and so that's why it was denied at that point. Okay. And what do you do? I mean, there's some force, I think, to the point you made, that the prosecutor doesn't get a free pass for the first black juror they strike. But what do we do with the language in Batson itself where the court said, we decline to formulate particular procedures to be followed? And I don't know that there's a Supreme Court case that says that you can't do the sort of sequential one-by-one analysis of Batson challenges that I was asking about earlier. So what's your answer to that? Well, Your Honor, in addition to Batson, I would also point this court to Perquette. And there the court recognized that you cannot combine— when the court was reviewing a case where a trial court attempted to combine steps two and three, instead of doing them in order, the trial court attempted to do away with both at one time. And that's where the Supreme Court emphasized that these steps all must be taken in sequential order. And so that is why that reasoning so too applies here, that to say that once step one has been created through an inference of discrimination, that the court can use a step three finding to now go back and undo a step one finding. Well, no, I mean, maybe we're— I think we might still be positing different understandings of what the Nevada Supreme Court did here. The theory I'm suggesting that maybe they adopted is not that the step three findings on Samuels and Smith undo the step one finding on Velazquez, but that at the time Velazquez was challenged, there wasn't yet a step one showing. And I know you disagree with that for the reasons we were just going through. And the trial court gets to rule on the challenge then and doesn't need to revisit that based on what happens later. And my question is what's—I mean, is Perkett your answer to the question of what case says that that mode of proceeding is impermissible? Yes, I would say Perkett, Your Honor. Okay. Yes. Okay. And if we agree with you—suppose that we agree with you with respect to Velazquez, but none of the other arguments you're making, what would we do if we think the Nevada Supreme Court was wrong, contrary to our unreasonably applying Supreme Court law in its treatment of Velazquez, and that's the only thing we find, what would we do? Yes. If this court agrees with our reasoning, then it would have to make a finding as to step one and then remand back to the district court for an evidentiary hearing as to step two because Batson requires that the prosecutor provide those race-neutral reasons and at no point in this case yet has the prosecutor provided the race-neutral reasons for Velazquez. And it's appropriate for those to be provided in the first instance in an evidentiary hearing in a federal district court? Yes, Your Honor. There has been other cases within this circuit where that has occurred. And how, as a practical matter, is this going to work? Because the events that we're talking about were 30 years ago. Yes. In the cases that I have researched and read, Your Honor, the prosecutor is called and is allowed to, if they remember those reasons, is allowed to state that. But courts have also permitted prosecutors to rely on their notes from that time and the transcript, or they cannot speculate, but they are allowed to use these things to recall their memory as to why they struck the juror. This is outside the record that we have in front of us. Do we know whether the participants, prosecutor or defense, do we know if they're still alive? To my knowledge, they are, Your Honor. Okay. To your knowledge, you mean so far as you know? You don't know they're dead? Or to your knowledge, they are alive? Oh, to my knowledge, they are alive. Okay. So you do know they are alive? Yes. Okay. Yes, the last time I checked. Okay. So the Nevada Supreme Court's opinion was not only unreasonable as to juror Velazquez, but it was also unreasonable as to the second juror who was struck, juror Samuels. The Nevada Supreme Court found that juror Samuels' strike— the Nevada Supreme Court's decision was an unreasonable determination of fact as to juror Samuels. It found that her striking was non-discriminatory because she had a family member who was incarcerated. There were no non-black jurors who similarly had family members who were incarcerated. And the disparate impact of family incarceration is not dispositive at step three. However, this was an unreasonable determination of fact because the Nevada Supreme Court's opinion entirely omitted any analysis concerning that when the prosecutors struck Samuels, the first reason they provided for striking her was pretextual. And it was found to be pretextual by the trial court. Indeed, prosecutors first stated that they were striking Samuels because she had children. And they did not believe that someone who had children would be able to sit on this veneer. It was only after the trial court pointed out that there were other jurors who had not been challenged who had children that the prosecutors proffered its second reason that Samuels' brother had been incarcerated. However, even that, too, is proved to be implausible based on the record we have before this. Now, while I will admit there were no other similarly situated non-black jurors who had family members who were incarcerated, that's not dispositive. Here, looking at evidence in the record, it demonstrates this was not credible, and specifically because the prosecutor mischaracterized Samuels' testimony and its reasoning for why it struck her. Prosecutors didn't just say they were striking Samuels because she had a brother who was incarcerated. Specifically, prosecutors stated that Ms. Samuels was going to be thinking about her brother in relationship to what she should do in Doyle's case, and that it would put too much pressure on her. But Samuels' testimony during voir dire indicated the exact opposite. She indicated that she was not close with her brother. She didn't know where he was incarcerated, whether or not he had a trial, or what exactly he had been convicted of as the crime had happened nearly 25 years prior. Moreover... If I may interrupt, wasn't her brother convicted of murder, and she was the only juror whose family member was convicted for murder? Isn't that a differentiating fact? Your Honor, yes, she was the only juror who had a family member who was convicted of murder, but that fact is not dispositive at Step 3. And prosecutors stated that they weren't just concerned that she had a brother who was a family member. They were concerned that this would put too much pressure on her, and that she would be thinking about her brother. But her testimony indicated that that simply wasn't true, and prosecutors failed to ask Samuels a single question during voir dire about the fact that her brother was incarcerated or what impact that would have on her. And the Supreme Court stated in Miller L2 that the state's failure to engage in any meaningful voir dire examination on a subject it alleges it's concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination. So how do we know that the brother's in prison for murder? She says, I think or I heard. Do we have any evidence beyond what she says? No, Your Honor, precisely. That's what she stated, that she actually had only heard from second-hand sources that that's what he was incarcerated for, but she wasn't even sure, which further indicates that she wasn't close with her brother. So it is for these reasons, Your Honor, that we would ask this court as to Batson to remand back to the district court for an evidentiary hearing. And if there are no further questions regarding Batson, I'd like to spend some of my time on tolling. The district court dismissed 80% of Doyle's claims without consideration on the merits on the basis of untimeliness. This court should find that Doyle is entitled to equitable tolling because he reasonably relied on a confluence of factors in determining that if he filed his amended petition in accordance with the district court's standard scheduling orders, it would be timely. As this court is well aware, this court has already recognized in Williams v. Filson that the change of law in Mayo v. Felix has entitled petitioners to equitable tolling. The reasoning in Williams should similarly apply here because Doyle's case was being governed by the same scheduling orders at issue in Williams. The difficulty in this case, though, is that even after Mayo came out, there was a considerable delay before he filed the amended petition. So isn't that reflective of lack of diligence, which would be a requirement for tolling? No, Your Honor. Mayo was not instructive to petitioners like Doyle who had already run out of time. And Mayo did not provide guidance to petitioners like Doyle in how, after relying on the unsettled state of the law, he had passed his edpa time by four years in how to comply. And so Doyle was reasonable in assuming that he would be grandfathered in and he would need to comply with the district court's standard scheduling orders in order to have a timely petition. And it's important to note that the test under Holland is reasonable diligence, not maximum feasible diligence. And so Doyle was diligent in the time after Mayo that he took to file his petition because he continued to pursue discovery in accordance with the district court's scheduling orders. And, indeed, he was required to file status updates every 60 days with the court after Mayo, and he also was seeking judicial intervention because the state was refusing to comply. So by continuing to comply and seek discovery, Doyle demonstrated that he was pursuing his rights and diligent in the time after Mayo. And Doyle was not alone in this assumption that the district court's standard scheduling orders were still governing his case. The district court's conduct after Mayo also indicated that the district court shared this assumption. After Mayo, the district court did not amend its scheduling orders, referencing Mayo or changing the standard scheduling practice, and the district court continued to issue extensions of time for discovery and extensions of time for Doyle to file his amended petition after discovery had concluded. Neither does the state's conduct. After Mayo, the state did not oppose extensions of time. The state did not expose... Excuse me. The state did not oppose the district court's granting of extensions of time for discovery, and the state waited four years after Mayo before it raised its first timeliness objection. So it is for these reasons, Your Honors, that it's clear from the course of conduct of the parties that everyone reasonably believed that if Doyle filed his amended petition in accordance with the district court's scheduling orders, it would be timely, and as to tolling, we would ask this court to remand to the district court for full consideration of Doyle's claims on the merits. And if there are no questions, Your Honor, I will reserve the rest of my time for rebuttal. You may. Thank you. Ms. Proctor. Good afternoon, and may it please the Court, my name is Heather Proctor, and I have the honor of representing the respondents in this matter. Excuse me. I'd first like to address the exclusion of Ms. Samuels from the voir dire. The prosecutor did initially reference that Ms. Samuels had two small children, but the prosecutor also noted that she did have a brother who was incarcerated for first-degree murder, and Ms. Samuels actually stated that they say that he killed someone, so she wasn't even sure as to his guilt. As already noted, there were only other individuals on their perspective voir dire that had a similar situation of someone who was incarcerated for a serious felony was Ms. Smith, and the state district court actually noted that after the... You mean Ms. Samuels? No, Your Honor. Ms. Samuels was the second juror who was struck, and Ms. Smith was the third juror who was struck. But I thought it was Samuels who had... Samuels has the brother in prison, correct? Yes, Your Honor. Ms. Samuels had the brother in prison for first-degree murder. Ms. Smith had the brother in prison for the robbery, I believe. I'm sorry. And the probation violation. Of course, Your Honor. And the state district court noted that following the exclusion of Ms. Samuels, the court was concerned, would be surprised if the prosecution did not use a peremptory challenge to strike Ms. Smith because she was a similarly situated individual who had also a brother who was incarcerated for a violent felony and was the only other perspective juror who had an individual who was incarcerated for a violent felony. And the Nevada Supreme Court's determination on those facts was entitled to deference by this court. And what about the fact that, I mean, assuming that to be a good reason for the strike, before the prosecutor got around to saying that, they offered another reason that I think everybody agrees was not actually true, and the Nevada Supreme Court did not consider that. But isn't that evidence, at least some evidence suggestive of pretext that needs to be considered, doesn't it? Your Honor, that was certainly the first reason the prosecutor gave. It wasn't the only reason. And, yes, the state district court did note that there were others in the jury, but there's no indication that that was the only reason the prosecutor intended to provide. It was simply the first reason the prosecutor gave, and then the court made its determination that there were others on that jury who were similarly situated, and the court provided that second reason. That second reason alone was certainly sufficient to support the Nevada Supreme Court's conclusion that the prosecutor provided a race-neutral reason for excluding Ms. Samuels. But what do we do with the fact that the prosecutor advanced, I assume truthfully, as to the prosecutor's own motivation, a reason that was a non-reason? Your Honor, that was certainly the first reason that was given. No, I understand that, and what I'm asking is, the prosecutor gave us a reason that this is why I did it. Well, if that's a reason why he did it, he's ignoring that he had that very same reason for non-black jurors. In other words, one of the reasons he had, maybe it's not a sufficient reason, but one of the reasons he had applied only to a black veneer person, and it did not apply to the others. Your Honor, that is certainly true that he did give that as his first reason. It was not his only reason. No, I understand that, but even having given that reason, assuming that he's truthful in saying that that is a reason, and I'm not charging him with telling a lie, assuming that that's a reason why he did it, well, he had a reason for excluding the black juror, and then he had exactly the same situation and did not use that reason for a white juror. That strikes me as discriminatory. Your Honor, you are certainly correct that there were other non-African American jurors who did have a similar reason, but we cannot ignore the fact that that was only one of multiple reasons the prosecutor did give. How many discriminatory reasons do we need? I think we only need one. Your Honor, there has to be an indication of discriminatory intent, and the fact is... There's clearly an indication. If that's a genuine reason, if he's telling the truth that that's why he did it, that's a discriminatory reason given that he doesn't use that same reason where it's applicable for white jurors. Your Honor, that is correct as to that first reason, but it was not the only reason. No, I understand that, but are you agreeing with me that if we look only at that first reason, I understand there's a second reason, but given that he applies the reason to a black person but not to a white person, that sounds to me like a discriminatory reason. Why am I wrong about that? Your Honor, if that was the only reason he gave... No, no, I understand it's not the only reason, but I want you to look only at this reason for purposes of answering the question. Is that a discriminatory reason? Your Honor, it certainly applied to non-African-American jurors as well, yes. No, it did not apply. That other non-African-American jurors also had children at home. That was correct. So he said this is the reason, this is a reason why I'm disqualifying. Over here is the same reason, but I'm not using that reason to disqualify. You're correct, Your Honor, but under Batson we do have to look at the circumstances surrounding the exclusion, and not just the one reason but all of the reasons the prosecutor gave. The prosecutor did give a non-discriminatory reason for excluding Ms. Samuels as well. No, I understand that. Maybe you can turn to Velasquez. I've read footnote 2 in the Nevada Supreme Court decision probably a dozen times at this point, and I'm not sure I understand what their rationale was for saying that the trial court did not need to require an explanation for the striking of Ms. Velasquez. So what do you understand the Nevada Supreme Court to have held? Your Honor, based on Ms. Velasquez, the court did note that it wasn't necessary to go to that second question because she was the first peremptory challenge by the state, and as that first peremptory challenge, there was no pattern of intentional discrimination, and there does have to be some sort of indication of intentional discrimination. But then why did they say after accepting the state's explanation for the exclusion of Ms. Samuels and Ms. Smith? That seems to suggest that it had something to do with accepting the explanation for Samuels and Smith. Am I wrong to read it that way? No, Your Honor. So then, I mean, is what they're saying, in your view, that you have a pattern, Velasquez, Samuels, Smith, you've accepted that there's a race-neutral explanation for Samuels and Smith, now we no longer have a pattern, and therefore we don't need to go to step two on Velasquez? Is that what they were saying? Your Honor, I think you have to read that footnote regarding Velasquez in conjunction with the Nevada Supreme Court addressing the first prong of Batson, where the Nevada Supreme Court said, Presumably, we're going to assume Ms. Velasquez is African American. We're going to presume that striking three out of four black jurors would be prima facie case of discriminatory intent, but we don't have to make that decision here. So the Nevada Supreme Court never actually found that the prima facie evidence had been established. Clearly, they didn't find that a prima facie case was established. My question is, why? Why did they not think that there was a prima facie case with respect to Velasquez? Your Honor, the Nevada Supreme Court relied on Hernandez, and in Hernandez, the prosecutor, the state district court never actually ruled on the first step of Batson. They went straight to the second and third steps of Batson, and in Hernandez, the United States Supreme Court said, That's okay. You don't actually have to reach the first step of Batson if you get both the second and third steps. And so in Hernandez, that was acceptable, and that was the case the Nevada Supreme Court relied upon. But they never did go to the second and third step for Velasquez. That is correct, Your Honor. And so the argument would be, based on that decision in Hernandez, the state district court never actually ruled on the prima facie evidence as the first step of Batson. Right, but the question to which I still would like your answer to is, why did the Nevada Supreme Court think that that was okay? Your Honor, the determination was that there was no pattern. With Ms. Velasquez, there was no pattern established when they first used the preemptory challenge, and there was no pattern established when the defense counsel asked them to revisit Ms. Velasquez on that first day of trial after they discussed Ms. Smith. But at that point, though, when defense counsel asks the trial court to go back and revisit Velasquez, at that point he's got three out of four, right? So that seems like a pattern, doesn't it? Yes, Your Honor. The state district court actually addressed, because defense counsel argued, you know, we've struck three out of four jurors, we do have to determine that there is a pattern here. And the state district court found, no, I'm not going to use a determination of percentages. There is no pattern as to Ms. Velasquez. She was the first juror. You haven't established any discriminatory intent because I've already determined that under Smith and Samuels there was no discriminatory intent. Okay, so then I think you are saying, and tell me if this is not true, but it sounds like what you're saying is the thing I suggested at the beginning, that the reason that there was no pattern, the reason that you don't get past Step 1 with respect to Velasquez is because having looked at Steps 2 and 3 with respect to Samuels and Smith, you find no intentional discrimination there. And so now they're effectively off the table and therefore there's no more pattern. Is that a fair characterization of what you think the state courts held? Yes, Your Honor. Okay. Let me ask you this. I want you to respond to what we heard from the other side even before we get to the questioning of the other black women in the veneer. So we're just at the stage of questioning Velasquez. The contention is there was already reason to believe that there was an inference of discrimination based on the pattern of questioning of the jurors or prospective jurors that had preceded Velasquez and compare that questioning to the questioning given to Velasquez and then look at the characteristics of Velasquez who has a great deal of respect for police and a very close friend who is a policeman. So why is that not enough right then to require that there be questioning because there's been a prima facie case? Your Honor, we don't know what the prosecutor was considering when they were doing this discussion. And when you're looking at a Batson analysis and determining whether or not there's a discriminatory intent, not necessarily step one. Well, you don't need very much to require the first questioning in order to get past that first step of Batson. All you need is an inference. And why is it not enough of an inference that we have questioning that's quite differential as to white prospective jury people compared to a questioning of Velasquez combined with, you know, as I look at Velasquez, irrespective of color, I'm the prosecutor. I look at a pretty good witness. A close friend is a retired policeman, a great deal of respect for, you know, looks like a pretty good juror to me. Your Honor, unfortunately, we do not know what the prosecutor was considering with respect to Ms. Velasquez. Well, what we do know is what the prosecutor asked prior veneer people compared to what the prosecutor asked Velasquez. Why is that not enough by itself to suggest enough that we have to get a response as to why? Your Honor, the questions that were asked prior to Ms. Velasquez were consistent with the questions that the prosecutor was asking other prospective jurors. Were they consistent with the questions asked of Ms. Velasquez? Yes, Your Honor. They were more detailed. They were more in-depth. We got four very generic questions of Velasquez, and that was it. Your Honor, the other prospective jurors to whom the prosecutor went more in-depth were based on the questions... Excuse me, the answers those prospective jurors gave to the court's initial questions as to do you have any other... Do you know anybody who has been in the legal system? Do you know anybody? Have you been a victim of crime? The prosecutor's in-depth questioning asked to those prospective jurors were directly as a result of their earlier questions and responses to the court's inquiries. So those additional questions in and of themselves were not a demonstration of discriminatory intent. Not even a sufficient suggestion just to require any further questioning? No, Your Honor. When taken in context, no. Do we know... Maybe I missed it in the record. I saw some jury questionnaires. Do we know of all the entire jury pool, their entire background? I don't know if there's a way to figure that out. And the reason why I ask is, you know, Ms. Velasquez isn't, objectively speaking, the worst juror for the prosecution. As Judge Fletcher mentioned, some of the things of friends with the police, generally good experience with the police. On the other hand, she did have a niece who had problems with the law. Is there something in the record that shows what, at the time of her voir dire, what the characteristics or backgrounds of the other jurors were? Your Honor, unfortunately, the jury questionnaires were never made part of the state court record. They were never before the Nevada Supreme Court. At the time, it made its determination. I thought I saw some questionnaires in the... Did I miss something in the record? I mean, it's voluminous. I thought I saw something, but I don't know if that were all of them or not, but at least a few, a handful, I thought I saw some of them. There was a very small handful, but we do not have all the juror questionnaires to be able to determine if other jurors were similarly situated from their jury questionnaires alone. Let me ask you this. The questionnaires were not in front of the Nevada Supreme Court. Are any of them or all of them in the record now, put in the record later? There is a very small number of juror questionnaires in the record. They were not... The Nevada Supreme Court specifically noted that they were never presented. And are those that are now in the record in front of the Nevada Supreme Court Can we consider them? Or are we foreclosed from considering them because they were not in front of the Nevada Supreme Court? You are foreclosed from considering those as they were not part of the record. Well, they were part of the record in the trial court. They were part of the record of the trial court, but you have to look at this case from a consideration because you're evaluating the Nevada Supreme Court's decision. You have to look at it from the perspective of records Doyle's counsel provided to the court or the state district court provided to the court. The jury questionnaires were not part of the docket and they were not presented to the Nevada Supreme Court on direct appeal. So in terms of our comparing the questioning or what information was in front of the lawyers, in front of the judge, the only thing we can look at is the transcript? That is correct, Your Honor. Okay. And what do you say to the argument your friend on the other side makes that the mode of proceeding that... We were discussing earlier that the Nevada Supreme Court seems to have adopted here, seems to create a rule where the prosecutor can strike a bunch of black jurors and then somebody makes a Batson challenge and if they struck N jurors, they really only need to explain N-1 of them because they say, here's my race-neutral explanation for all but one of them. I've offered that and the court accepts that. Now we only have one left and one isn't a pattern. So I don't need to explain that one. Is that really consistent with Batson? Your Honor, it is consistent with Batson. Batson does point to two examples of what can be used to determine if there's prima facie evidence of discriminatory intent. One is a pattern and one is the prosecutor's questions and statements made on the record. And as stated earlier, the prosecutor did ask some questions of potential prospective jurors in response to their earlier questions. But the prosecutor did not make an indication otherwise that they were acting with discriminatory intent, as to Ms. Velazquez. Yeah, I mean, it says one way to do it is a pattern, but it doesn't say, and I don't know of any case that says that the pattern ceases to be a pattern for purposes of Step 1 once you have explained away some of the strikes at Step 2 that you get to go back. So, I mean, is there a case that says that? Your Honor, we only have Hernandez, which does state that if you do make a determination that it is not necessary to do a strike, excuse me, a Step 1 analysis if a race-neutral reason has been given for the Steps 2 and 3. And that's what the Nevada Supreme Court relied on, and that's what the district court relied on below in determining that the Nevada Supreme Court's decision was a reasonable interpretation of federal law. When you say a race-neutral explanation, let me come back to the question I'd asked you earlier. There were two explanations given. One was children, and the other one was a brother in prison. Correct. Now, I want to proceed from the assumption that the first one was not race-neutral. You're saying that the second one was, but in terms of evaluating permissible objection, we don't need to show that the dominant reason was racially discriminatory. All we need to show is that there was something that was racially discriminatory. Isn't that right? We don't have to show that the dominant reason was discrimination. Your Honor, you do have to... You are... You're taking two multiple explanations, and you're focusing on one. Yes, I am, but I'm asking you, why do we get to disregard that, which is what you want us to do? Your Honor, I'm not asking you to disregard that. I'm asking you to consider that one of the reasons that was given was a race-neutral reason. Well, but one of the others, at least as the way I'm tempted to look at it, was not race-neutral. Your Honor, there were multiple reasons that was given for both Ms. Samuels and Ms. Smith. If there was a nondiscriminatory reason that was given that was unique to the individuals who were struck and was not in common with the other struck jurors, then there was a... And the court determines that that was a race-neutral reason for striking those individuals, and it's conceded that there is no other individual who had that determination. Let me ask you this in a slightly abstract way. Let's say that I have two reasons for striking the jury. One is based on race, and the other is not. And I just say to the judge, well, listen, one of my reasons is she's black. The other one is that she's got this other... Am I okay in making the objection when I've got one race-based reason and one non-race-based reason? I don't think so. That's correct, Your Honor. Yeah, so what do we do then with the first one, which is to say... You said one of my reasons is she has kids, and as to white people, that's not a reason. Your Honor, all I can state is that was not... That was a basis. Other non-black prospective jurors did have children that they were caring for. No, no, that's exactly what I'm worried about, yes. I don't believe... I'm not entirely sure, and I'm not 100% of this. I don't know if any others were being cared for by the prospective juror who was in the courtroom, but there was... I don't believe that it was discriminatory in and of itself. It was part of the reasoning that was given for the jury, and I don't believe Batson addresses when there are multiple reasons given for a prospect... Excuse me. When a prosecutor provides multiple reasons for excusing a juror, you can only focus on one of those reasons. I think the established case law under Batson is if there is a discriminatory reason that the prosecutor has, that's enough to violate Batson, even though there may be other non-discriminatory reasons, which is what I think you conceded two minutes ago. Your Honor, that is correct. Yeah. But we still have to look at the record as a whole. Okay. Can I ask you the same question I asked your friend on the other side? If we conclude that they're right on Velazquez but you're right on everything else, what do we do? Your Honor, I do agree that this can be remanded to permit the prosecutor to provide a neutral reason. I do know that at least one, I believe both of the prosecutors are still living. I have not checked on the defense attorney, and that would be consistent with circuit case law. And so the district court would then just be deciding de novo, I guess, at this hearing, like do I think that the strike against Velazquez was on the basis of race or not. Is that right? Yes, Your Honor. So we don't have to send this back to the state court to do the hearing first? The district court can do it itself? Your Honor, if this court determines that the Nevada Supreme Court's decision was not entitled to deference, then yes, it could be remanded back for a de novo review. Okay. As to the second argument regarding the equitable tolling, the fact remains that once mail was decided in 2005, Doyle continued for another three years to conduct discovery and to continue seeking extensions in order to file the amended federal habeas petition. There's no question that once mail was decided in 2005 that the petitioner would have to determine, argue that his claims related back to the original timely petition. The scheduling order that was issued in 2000 prior to AEDPA expiring and prior to mail were very clear that the scheduling order did not mandate that any new claims in the amended petition would relate back. It did not state that if there was some unknown case that was decided in five years that everything would be grandfathered in. There was no indication from the scheduling order that any amended petition would relate back that would undermine the determination in mail. The fact is that mail came out and they continued to delay in filing that first amended petition for another three years. And there's nothing in mail or any other case law that permits a petitioner to continue litigating and conducting discovery to attempt to discover new claims forever. There has to be some stopping point at some point that they have to come to the federal court with their final claims. And they did that eventually three years later. Williams is an opposite. In Williams, the petitioner filed his amended petition prior to mail. And we're not addressing the status of the claims. There was a certain amount of unsettled law prior to mail. But once mail was decided, that unsettled law was no longer in effect. The petitioner knew he had to satisfy Rule 15C in order to argue his claims related back as of the decision in mail. And he took another three years to file his amended federal habeas petition. Nothing in the scheduling order misled the petitioner to believe that he was somehow grandfathered in or that he would not be held susceptible to the mail decision. Let me go back, if I can. I understand your position as to how it would work out. But is there anything that prevents us from looking at the questions asked of the veneer persons before the questions are asked of Velasquez in trying to determine whether or not there's a prima facie case? Your Honor, according to Batson, you look at the prosecutor's questions and statements as to the juror that was struck. I know, but I'm asking comparatively. Is there anything that prevents us from looking back at the questions of the earlier jurors to determine whether there's a differential in questioning? Your Honor, I don't know that that was necessarily permitted in Batson in 1997 in the Batson line of cases. Well, in the Batson line of cases, they say is there something from which we can infer. Is it excluded to say we can't look back at questions that were asked before of veneer people before? No, Your Honor. Okay. Unless there are any questions on these two issues or any other. All right. Thank you, Your Honor. Thank you. Thank you, Your Honors. There were a few points that I would like to touch upon in rebuttal. First, whatever angle that you look at the Nevada Supreme Court's opinion, failing to require the prosecutor to provide race-neutral reasons as to juror Velazquez was contrary to or an unreasonable application of currently established federal law. If the Nevada Supreme Court determined that Doyle could only establish a prima facie case through a pattern and that was contrary to Batson, as Batson emphatically requires that you do not need a pattern or the Nevada Supreme Court merely looked at the pattern but negated that pattern after the Samuels and Smith strikings were found to be nondiscriminatory. And that is unreasonable under Batson and Perquette because it misapplies those two cases and conflates the steps in the burden-shifting framework which the Supreme Court has consistently reaffirmed have to be taken within sequence. It would also undermine Batson because it would allow prosecutors to receive a free strike. Second, Your Honor, in reference to the juror questionnaires, while the juror questionnaires were not before the Nevada Supreme Court, they were before the state court, and so this court can consider them under de novo review. Moreover, all of the questionnaires for the jurors who were seated are within the record, and there are also some questionnaires from jurors who were not seated, but their questioning was still concerning. Furthermore, there is evidence in the record of the statements that were given from information in the questionnaires that is more than sufficient to show and raise an inference of discrimination. So on what ground can we look at the questionnaires even though the Nevada Supreme Court did not? Under de novo review, if this court finds that the Nevada Supreme Court applied an incorrect legal framework, then this court can review the questionnaires. However, a lot of the information that is within the questionnaires is already available within the record during voir dire because trial counsel pointed to different issues that jurors referenced in their questionnaires within voir dire. And the final point that I wanted to make, Your Honors, in regards to Juror Samuels, it's important to note that Miller L2 states that the pretextual answer that was given by prosecutors should be considered at Step 3 because it is the totality of all relevant circumstances. That's the test. Not merely if prosecutors provided a race-neutral reason, it's whether the totality of all circumstances raised create that it was a discrimination that motivated the prosecutor. And it's also important to note that whether or not the reason was race-neutral is not the test at Step 3. At Step 3, it's whether or not that race-neutral reason was credible. Very likely a prosecutor will provide a race-neutral reason at Step 2. But at Step 3, courts have to determine, based on those circumstances in the record, whether it was credible and whether it was plausible. And here, as to Juror Samuels, we know that it was not because the prosecutor mischaracterized her provided a pretextual first reason, the prosecutor mischaracterized her testimony in regards to her brother, and the prosecutor didn't ask her a single question concerning her brother as it would have had that truly mattered. And it's for those reasons that we're asking this court to remand back to the district court for an evidentiary hearing as to the Batson claim and for full consideration on the merits of Doyle's other claims. Thank you so much. Thank you. We thank both counsel for their helpful arguments, and the case is submitted, and we are adjourned. All rise.
judges: FLETCHER, MILLER, LEE